## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

WILLIAM KELLY,

Plaintiff,

Case No.: 2:22-cv-10589

v.

Hon.:

CORIZON HEALTH, Inc.,
a Delaware corporation.;
QUALITY CORRECTIONAL
CARE OF MICHIGAN, P.C., a
Michigan professional corporation;
JOSHUA KOCHA;
DANIELLE ALFORD;
LEILA GHASEMI;
DR. RAVI YARID;
DR. RICHARD A. BOHJANEN,
and DR. TODD K. BOSTWICK,

JURY DEMAND

Defendants.

Laurence H. Margolis (P69635)
Ian T. Cross (P83367)
Attorneys for Plaintiff
402 W. Liberty St.
Ann Arbor, MI 48103
(734) 994-9590
larry@lawinannarbor.com
ian@lawinannarbor.com

---

## COMPLAINT

1

Plaintiff WILLIAM KELLY, by and through his attorneys, LAURENCE H. MARGOLIS and IAN T. CROSS, brings this action for legal and equitable relief against Defendants for deprivation of Plaintiff's federally protected civil rights pursuant to 42 U.S.C § 1983, and for medical malpractice and ordinary negligence under Michigan law. For his cause of action against Defendants, Plaintiff respectfully states as follows:

## JURISDICTION AND VENUE

1. This action is brought against the Defendants pursuant to 42 U.S.C § 1983 for deprivation of civil rights secured by the Eighth Amendment to the United States Constitution, and for negligence and medical malpractice under Michigan common law and Michigan statutes governing medical malpractice actions, including MCL § 600.5838a.

2. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

3. Defendant Corizon Health, Inc. is subject to the Court's personal jurisdiction within the State of Michigan.

4. Defendant Corizon Health, Inc. maintains contacts within the Eastern District of Michigan that would be sufficient to subject it to personal jurisdiction in the Eastern District of Michigan if the Eastern District of

2

Michigan were a separate State. Such contacts include its ongoing provision of medical services at county-operated correctional facilities in St. Clair County, Genesee County, and Saginaw County, all within the Eastern District of Michigan.

5. Defendant Danielle Alford resides in Washtenaw County in the Eastern District of Michigan.

6. On information and belief, all Defendants are "residents" of the State of Michigan as that term is defined in 28 U.S.C. § 1391(c).

7. A substantial part of the events and omissions giving rise to these claims occurred in Jackson County, in the Eastern District of Michigan.

8.  Venue in this District is proper per 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).


# THE PARTIES

9. Plaintiff William Kelly is a former prisoner who was incarcerated in the Michigan Department of Corrections from April of 2015 until his release on parole on July 7, 2021.

10. Defendant Corizon Health, Inc. (hereafter "Corizon") is a for-profit Delaware corporation that contracts with state and municipal governments to provide healthcare to incarcerated persons. At all times relevant to this

action, Defendant Corizon Health, Inc. was the contracted healthcare provider for the Michigan Department of Corrections.

11. Defendant Quality Correctional Care of Michigan, P.C. is a shell corporation maintained by Defendant Corizon for the purpose of circumventing Michigan's prohibition on the corporate practice of medicine. The State of Michigan prohibits for-profit entities that are directly or beneficially owned or controlled by non-physicians from employing physicians to provide medical services. *See* MCL § 450.1283; MCL § 450.1288; MCL § 450.4908; MCL § 450.4904. This prohibition only applies to for-profit entities, "since the principal evils attendant upon corporate practice of medicine spring from the conflict between the professional standards and obligations of the doctors and the profit motive of the corporation employer,"  Michigan Attorney General Opinion No. 6770 (Sept. 17, 1993) (**Ex. A**), and "these evils are only likely to arise . . . when the physician is being supervised by a profit-seeking employer." *Id.* (citations omitted).

12. Defendant Corizon is beneficially owned and controlled by Flacks Group, LLC, a Miami-based private equity firm. Flacks Group, LLC is a for-profit entity, and on information and belief, the beneficial owners of Flacks Group, LLC are not physicians licensed to practice medicine in Michigan.

4

13. Because Defendant Corizon cannot lawfully operate a business that provides medical care for profit in Michigan, it maintains Defendant Quality Correctional Care of Michigan, P.C. to serve as the nominal employer of its Michigan-based physicians, nurse-practitioners, and physician's assistants.

14. Defendant Quality Correctional Care of Michigan, P.C. is functionally controlled by Defendant Corizon. Defendant Corizon manages payroll, HR functions, and accounting for Quality Correctional Care of Michigan, P.C. Defendant Corizon recruits licensed-medical-professional employees to work for Quality Correctional Care of Michigan, P.C. and covers defense costs when Quality Correctional Care of Michigan, P.C. is sued.

15. Defendant Quality Correctional Care of Michigan, P.C. has never contracted to provide services to any client other than Defendant Corizon (or Corizon's corporate predecessors), and has the same office address as Defendant Corizon.

16. Nominal employment by Defendant Quality Correctional Care of Michigan, P.C. does not afford Michigan physicians professional independence from Corizon's supervision. Tennessee-based employees of Defendant Corizon directly supervise certain physician-employees of Defendant Quality Correctional Care of Michigan, P.C., monitor the performance of the

5

physician-employees of Defendant Quality Correctional Care of Michigan, P.C., including aspects of their performance that directly implicate professional medical judgment, and write annual performance reviews for physician-employees of Defendant Quality Correctional Care of Michigan, P.C.

17. Although Defendant Quality Correctional Care of Michigan, P.C. is nominally a for-profit entity, Defendant Quality Correctional Care of Michigan, P.C. and Corizon are not engaged in an arms-length business relationship in which Defendant Quality Correctional Care of Michigan, P.C. sells medical services to Corizon in an effort to turn a profit for its shareholders. Instead, Defendant Quality Correctional Care of Michigan, P.C. it merely passes through its expenses to Defendant Corizon.

18. Defendant Quality Correctional Care of Michigan, P.C. is a mere instrumentality or alter-ego of Defendant Corizon, and Corizon's control over Defendant Quality Correctional Care of Michigan, P.C. is so complete that Defendant Quality Correctional Care of Michigan, P.C. has no separate mind, will, or existence of its own.

19. As Defendants Corizon and Quality Correctional Care of Michigan, P.C. are functionally the same entity, all allegations applicable to Defendant Corizon

are equally applicable to Defendant Quality Correctional Care of Michigan, P.C., and all allegations applicable to Defendant Quality Correctional Care of Michigan, P.C. are equally applicable to Defendant Corizon.

20.   Defendants Joshua Kocha, Leila Ghasemi, Danielle Alford, Dr. Richard Bohjanen, and Dr. Ravi Yarid are medical professionals who were, at all times relevant to this Complaint, employed by Defendant Corizon and/or its alter-ego Defendant Quality Correctional Care of Michigan, P.C. to provide medical services to prisoners in the Michigan Department of Corrections.

21.   Defendants Joshua Kocha and Danielle Alford are Physician's Assistants, Defendant Leila Ghasemi is a Nurse Practitioner, and Defendants Dr. Ravi Yarid and Dr. Richard Bohjanen are physicians. At all times relevant to this action, Defendants Bohjanen and Kocha was stationed at the Marquette Branch Prison in Marquette, Michigan, Defendants Alford and Ghasemi were stationed at Duane Waters Health Center, an MDOC-operated health center for prisoners in Jackson, Michigan, and Defendant Dr. Ravi Yarid was stationed at the Robert G. Cotton Correctional Facility in Jackson, Michigan.

22.   Defendant Dr. Todd K. Bostwick, M.D. is a board-certified diagnostic radiologist who practices in the vicinity of Marquette, Michigan. At all times

7

relevant to this action, Defendant Bostwick did not work at a prison, nor was he employed by either Defendant Quality Correctional Care of Michigan, P.C. or by Defendant Corizon.

## COMMON ALLEGATIONS

23. Plaintiff William Kelly is fifty-nine years old. He has metastatic renal cell carcinoma (kidney cancer). Mr. Kelly's cancer originated in his left kidney, but has since spread throughout his body, including to his liver, spine, and testicles.

24. The Tumor-Node-Metastasis (TNM) staging system, also known as the American Joint Committee on Cancer (AJCC) staging system, is the internationally-recognized standard for classifying the anatomical extent of solid tumor cancers, including renal cell carcinomas.

25. Under the TNM system, renal cell carcinomas are classified as Stage I, II, III, or IV. Stage IV renal cell carcinoma represents the most advanced stage of the disease and is defined as a cancer which has spread outside of the renal fascia. Renal cancer can spread outside the renal fascia either via distant metastases, which occur when cancer cells travel through the bloodstream or lymphatic system and then establish new tumors in remote areas of the body, or when the

primary tumor invades through the renal fascia. The renal fascia is a layer of connective tissue that encapsulates the kidneys, some adjacent fat tissue, and some related anatomical structures. (**See Ex. B: Kidney Cancer TNM Staging**).

26. Mr. Kelly's cancer is classified as Stage IV. Patients with Stage IV kidney cancer have a relatively poor prognosis: the AJCC Cancer Staging Manual, 7th Edition (2010) reports five-year survival for Stage IV renal cell carcinoma patients at 8.2%, and one-year survival at 34.2%. Patients with Stage I, II, and III renal cell carcinoma have significantly better prognoses: five-year survival is above 50% and one-year survival is above 80% for all stages of renal cell carcinoma below Stage IV. (**Ex. C: Stage-based survival in patients with RCC -UpToDate**).

27. The standard treatment for Stage I, II, and III kidney cancer is surgical removal of the affected kidney. If the cancer has not spread outside the kidney at the time of surgery, this treatment will typically be curative.

28. However, once the cancer has metastasized to various other areas of the patient's body, removing the affected kidney will not cure the cancer. After renal cell carcinoma has metastasized beyond the kidney and adjacent structures, the disease will usually progress until it causes the patient's death.

29. Therefore, when treating a patient with suspected or confirmed Stage I, II, or III kidney cancer, it is very important to perform surgery quickly, so the cancer can be removed from the body before it spreads beyond the affected kidney.

30. In this case, a CT scan of Mr. Kelly's abdomen taken on March 19, 2020 revealed a suspicious abnormality in the lower pole of his left kidney. From March of 2020 through September of 2020, Mr. Kelly reported symptoms consistent with kidney cancer to his prison medical providers, including blood in his urine, inability to urinate, testicular pain, bladder spasms, lower left back pain, and blood clots blocking his urethra.

31. On September 17, 2020, when medical providers at Marquette Branch Prison sent Mr. Kelly to the emergency room because he was unable to urinate, a second CT scan of Mr. Kelly's abdomen was taken, and it revealed a tumor in the lower pole of Mr. Kelly's left kidney suspicious for malignancy. The malignant mass in the left kidney was confirmed again via an ultrasound on October 15, 2020, again via an MRI on November 4, 2020, and yet again via another CT scan on December 15, 2020.

32. A fourth CT scan was performed on February 18, 2021. This scan, for the first time, revealed distant metastases growing on Mr. Kelly's liver and adrenal gland.

33. Due to a compounding series of acts and omissions of the Defendants that occurred between March 19, 2020 and February 18, 2021, the diagnosis and treatment of Mr. Kelly's renal cell carcinoma was repeatedly postponed, deferred, and delayed. Mr. Kelly's cancer progressed from Stage I to Stage IV over this eleven-month period, during which he underwent repeated imaging studies, but did not receive any treatment to slow or stop the spread of his cancer.

34. The acts and omissions of each Defendant contributed to the failure to remove Mr. Kelly's kidney before it was too late. Plaintiff will set forth factual allegations applicable to each Defendant in chronological order.

## I. Defendant Dr. Todd Bostwick, M.D.

35. Immediately prior to March 19, 2020, Plaintiff was housed in the Baraga Correctional Facility in Baraga, Michigan, where his primary-care provider was Nurse Practitioner Patricia Lewis.

36. In early 2020, Mr. Kelly had complained of cramping and pain in his left leg when walking any significant distance. NP Lewis had examined him and detected differential blood pressure readings in each leg. As part of her workup

of a diagnosis, on March 3, 2020, NP Lewis requested a CT scan of Mr. Kelly's lower extremities and torso.

37. NP Lewis' request was approved by Defendant Corizon's Utilization Management department, and Mr. Kelly underwent a CT scan at Baraga County Memorial Hospital on March 19, 2020.

38. Defendant Dr. Todd Bostwick was the radiologist assigned to read Mr. Kelly's March 19, 2020 CT scan.

39. Defendant Bostwick identified the cause of Mr. Kelly's leg pain as occlusion of segments of the left femoral artery in the mid-thigh due to plaque buildup, which was restricting blood flow to Mr. Kelly's left leg. But while reading the scan, Defendant Bostwick also noticed an abnormality in Mr. Kelly's left kidney.

40. Defendant Bostwick reported the abnormality was, "a developing infarct in the lower pole of the left kidney which is swollen, edematous, and shows decreased perfusion. This may represent shower emboli from the heart."

41. An infarct is a section of tissue that dies due to loss of access to sufficient oxygenated blood, typically due to an embolism. An embolism is a blockage of an artery caused by a foreign body such as a blood clot. "Shower emboli from the heart" occur when there is a blood clot in the heart, smaller chunks of

clotted blood are breaking off from the main clot, and these chunks are traveling down the patient's main arteries, getting lodged in smaller arteries, and blocking those smaller arteries.

42. In fact, Mr. Kelly did not have an infarct in his kidney or shower emboli emanating from his heart. He had a cancerous tumor in the lower pole of his left kidney.

43. The CT images from the March 19, 2020 scan were not consistent with Defendant Bostwick's report or diagnosis. The left kidney was swollen and edematous, as Defendant Bostwick reported. But rather than showing *decreased* perfusion in the lower pole of the left kidney, the axial CT images suggest *increased* perfusion in the lower pole of the left kidney compared to the right kidney. "Perfusion" is the volume of blood flowing to an area of tissue.

44. An infarct, where blood supply is cut off, will show decreased perfusion. But a cancerous tumor will typically show increased perfusion, because tumors need an ample supply of oxygenated blood to grow. Cancerous tumors obtain this blood supply by secreting growth-factor proteins that trigger angiogenesis, which is the growth of new blood vessels to supply the expanding tumor.

45. The fact that there is not an infarct in the lower pole of the left kidney can be seen from the appearance of the left renal vein in the axial image series from the

March 19, 2020 CT scan. The left renal vein is clearly patent (wide open) and enhancing early from the area that is hypervascular. This suggests that there is increased blood flow from the left kidney. If there was an infarct, the vein that drains the deoxygenated blood from the infarcted area would drain slower, or would not drain at all.

46. The coronal view in the March 19, 2020 CT scan shows over half of the left kidney enhancing less than the right kidney. While reduced enhancement in a contrast CT series can indicate an infarct, it is also common with some types of renal cell carcinoma.

47. A large arterial blockage (thrombus) would be necessary to create an infarct that involved over half of the kidney, yet no thrombus is visible in the left renal artery on the March 19th scan.

48. Some areas, particularly the axial view towards the bottom of the lower pole of the left kidney, show heterogeneous enhancement. This is also consistent with renal cell carcinoma.

49. A renal infarct is a relatively uncommon condition; a 2007 study published in the American Journal of Emergency Medicine estimated its incidence at 0.004%.[1] Kidney cancer, however, is one of the ten most common cancers in

---

1 *ED presentations of acute renal infarction.* Am J Emerg Med 25: 164–169, 2007

the United States, accounting for approximately 4% of new cancer diagnoses. The American Cancer Society estimates the lifetime probability of developing kidney cancer at 1 in 46 (2.02%) for males.[2]

50. Mr. Kelly's risk of developing an acute infarct in March of 2020 was also reduced because at the time, Mr. Kelly was taking Plavix, a blood thinner. Plavix reduces the risk of infarcts by preventing the formation of blood clots.

51. Typically, medical professionals who are not radiologists or surgeons do not look at the actual images from a patient's CT scan. Instead, they read a report that a radiology specialist writes about what the images show. Medical professionals who are not radiologists thus rely on radiology specialists thus to accurately interpret imaging studies.

52. Diagnostic radiologists such as Defendant Bostwick have a duty to accurately interpret and report imaging results. If a radiologist sees an abnormality in a patient's imaging study, but is unable to definitively determine what the abnormality is, the radiologist should not guess. Instead, the radiologist should acknowledge the uncertainty in his report, and identify the various things that the abnormality might be.

53. Defendant Bostwick's erroneous reading of the March 19, 2020 CT scan caused other medical professionals to believe that Mr. Kelly had a kidney infarct

---

2  https://www.cancer.org/cancer/kidney-cancer/about/key-statistics.html

caused by shower emboli emanating from his heart. When NP Lewis heard the results over the phone, she reacted by ordering Mr. Kelly immediately transported to the local ER.

54. ER staff at Baraga County Memorial Hospital administered intravenous Heparin, a blood thinner, to treat Mr. Kelly's suspected acute blood clot, and then had Mr. Kelly transported to a larger hospital in Marquette for additional emergent treatment.

55. On the following day at Marquette General Hospital, Mr. Kelly underwent an echocardiogram to search for the suspected blood clot that was throwing shower emboli in the heart. But no obvious clot or source of emboli was found.

56. Next, Mr. Kelly underwent an abdominal aortogram. An abdominal aortogram is an imaging procedure in which an incision is made in the leg so that a tube can be inserted into the femoral artery. The tube is then pushed up the femoral artery into the aorta, which is the main artery that carries blood out of the heart. The renal arteries, which carry oxygenated blood to the kidneys, branch off of the aorta. The tube is advanced "upstream" of the renal arteries. Then, a chemical containing iodine is injected into the bloodstream through the tube, while a continuous series of x-rays are taken of the patient's chest.

57. The iodine chemical, which mixes with blood, is visible on the x-rays, because iodine atoms easily absorbs photons in the x-ray range of the electromagnetic spectrum. This allows medical professionals to essentially watch a video of the patient's blood as it flows through his aorta and other arteries, starting from the point that they placed the tube when they began injecting the iodine chemical.

58. The abdominal aortogram performed on March 20, 2020 showed that Mr. Kelly's renal arteries were "widely patent," meaning they were wide-open, and there was no obvious obstruction blocking the flow of blood to the left kidney.

59. After the echocardiogram showed no apparent source of emboli emanating from the heart, and the abdominal aortogram showed no apparent blockage of blood flow to the left kidney, Defendant Bostwick's diagnosis of a kidney infarct caused by shower emboli from the heart began to make less sense. In a handwritten form describing the procedure, the doctor who performed the abdominal aortogram wrote, "Left renal artery main is normal? Small early venous filling inferior left pole."

## II. Defendants Corizon, Bohjanen, and Kocha

60. After his emergent admissions to Baraga County Memorial Hospital and transfer to Marquette General Hospital, Mr. Kelly was not transported back to

the Baraga Correctional Facility. Instead, he was brought to Marquette Branch Prison.

61. Upon his transfer to Marquette Branch Prison on March 21, 2020, Defendants Bohjanen and Kocha became Mr. Kelly's primary-care providers.

62. Defendant Kocha examined Mr. Kelly for the first time on April 3, 2020. He wrote that Mr. Kelly had a renal infarct "with normal creatinine, normal heart echo." Defendant Kocha decided to keep Mr. Kelly on blood thinners for six months, to treat what he assumed was a renal infarct.

63. On the night of May 28, 2020, Mr. Kelly told a guard that he had urinated blood. The guard contacted healthcare staff, and an on-duty nurse, Calvin Burdick, RN, saw Mr. Kelly in the late evening hours of May 28, 2020 or early morning hours of May 29, 2020.

64. Nurse Burdick placed a note describing the encounter in Mr. Kelly's electronic medical record. He reported that Mr. Kelly denied experiencing any pain or burning while urinating, and said he would not have noticed the blood if he had not looked down. RN Burdick also wrote that Mr. Kelly "denied any pain at current time, however he did state he had left sided back pain a couple days ago."

18

65. RN Burdick reported that he received a urine specimen from Mr. Kelly. He noted that the specimen was "very dark red," and that he placed it "in Clinic refrigerator." No urinalysis was ever performed on this sample. Defendant Kocha later wrote in Mr. Kelly's electronic medical record that the sample was apparently lost.

66. RN Burdick scheduled Mr. Kelly for an urgent follow-up appointment with Defendant Bohjanen, which occurred the next morning, on May 29, 2020.

67. Urine is produced in the kidneys, then travels down tubes that connect the kidneys to the bladder, which are called ureters. The urine is then stored in the bladder until the patient urinates. When the patient urinates, the urine travels down the urethra to be eliminated from the body. Blood in a patient's urine can enter at any point along this system, from the kidneys, to the ureters, to the bladder, to the urethra.

68. Visible blood in a patient's urine is called "gross hematuria." Gross hematuria can be caused by certain relatively less-serious conditions, like passing a kidney stone or a urinary tract infection. But it can also indicate a serious condition, like an infection or cancer in the bladder or kidneys.

69. When a patient passes a kidney stone, the patient usually experiences very intense pain. When a patient urinates blood due to a urinary tract infection, the

19

patient usually experiences a burning sensation with urination. But Mr. Kelly denied experiencing any pain or burning sensation while urinating blood on May 28, 2020.

70. Kidneys are located towards the back of a human torso, with one kidney on either side of the spine. "Left sided back pain," which RN Burdick recorded in the note he placed in Mr. Kelly's medical record, is significant in the context of Mr. Kelly's gross hematuria, because it represents pain in the area of Mr. Kelly's left kidney.

71. Defendant Bohjanen examined Mr. Kelly on the morning of May 29, 2020. He noted that Mr. Kelly "denies burning urination," and "denies personal or family hx of kidney stones or prostate problems." He also noted that Mr. Kelly "had some mid back pain for the last week or so, but it is improved at this time."

72. Defendant Bohjanen ordered a urinalysis and a Prostate-Specific Antigen (PSA) test, which is a test used to screen for prostate cancer. He advised Mr. Kelly to drink lots of water and return to healthcare if his symptoms returned.

73. Following the May 29, 2020 examination, Defendant Bohjanen did not know why Mr. Kelly had gross hematuria. But he had reason to suspect it was not a relatively benign pathology, like a kidney stone or urinary tract infection, because Mr. Kelly reported no burning or pain during urination. Defendant

Bohjanen also had reason to believe the bloody urine was related to Mr. Kelly's kidneys, because Mr. Kelly had reported recent onset of left-sided back pain.

74. If Defendant Bohjanen had looked at Mr. Kelly's electronic medical record, he would also have seen that Mr. Kelly was hospitalized for a suspected infarct of his left kidney about two months prior.

75. Defendant Corizon provides all of its medical professionals in Michigan with access to a subscription medical reference database, called UpToDate, to provide them guidance when they do not know what to do while treating a patient.

76. The UpToDate product features an "UpToDate Pathway" for evaluation of adults who present to primary-care providers with hematuria. An "UpToDate Pathway" is essentially a guided decision tree to assist primary care physicians such as Defendant Bohjanen in recommending treatment for conditions that they are unfamiliar with. The computer program presents a series of Yes/No questions to the user about the patient's symptoms. The user selects answers to the questions, and the UpToDate Pathway outputs a recommended diagnostic or treatment option.

77. In the UpToDate Pathway for adults with hematuria, if the user indicates that blood in the urine is visible to the naked eye, and that the patient is not

pregnant, all possible answers to other questions in the decision tree result in a recommendation to refer the patient to either a nephrologist or a urologist.

78. Defendant Bohjanen did not refer Mr. Kelly to a specialist on May 29th, 2020, or at any point thereafter, even though he did not know why blood was present in Mr. Kelly's urine. Instead, Defendant Bohjanen merely instructed Mr. Kelly to drink lots of fluids.

79. Defendant Bohjanen received the results of the PSA test he requested on June 12, 2020. Mr. Kelly's PSA level was reported as 0.2 ng/mL, which is within the normal range. Defendant Bohjanen took no further action to investigate the cause of Mr. Kelly's gross hematuria or left-sided back pain.

80. Defendant Kocha examined Mr. Kelly and reviewed his chart on July 2, 2020.

81. Defendant Kocha took note of both a) the recent history of problems with Mr. Kelly's left kidney, and b) the May 28th incident involving gross hematuria. On July 2, 2020, he wrote in the medical record: "Lab and UA recheck scheduled. After that, and likely regardless of the result, I would submit for a CT urogram (CT abd/pelvis without and with contrast for urography). He may then need a urology visit to get a cystoscopy."

82. When Defendant Kocha wrote "I would submit for" a CT urogram, he meant that he would submit something called a "407 request" or "consultation

request" to Defendant Corizon's Utilization Management department to seek approval for a specialist consult or procedure.

83. At all times relevant to this action, Defendant Corizon's medical providers at Michigan prisons were allowed to order a prisoner transported to the ER in the case of a medical emergency. But they were not allowed to make any referrals to specialists without seeking and obtaining prior authorization from Defendant Corizon's Utilization Management department.

84. The purpose of Defendant Corizon's prior-approval Utilization Management process for specialist referrals was to limit the volume of specialty care provided to prisoners, in order to save money for Defendant Corizon.

85. Corizon's Utilization Management staff scrutinized each referral request to determine if the requested service was "medically necessary," meaning necessary to prevent potential loss of life or limb or to necessary to enable the prisoner to complete activities of daily living. Corizon's Utilization Management staff also evaluated whether a less expensive treatment plan could be implemented by the Corizon/Quality Correctional Care of Michigan, P.C. employees on site.

86. If Utilization Management staff believed that the requested specialty care could be avoided, they "ATP'd" the request. "ATP" stands for "Alternative Treatment

23

Plan." Utilization Management staff would instruct the on-site provider to administer Utilization Management's "alternative treatment plan" to the inmate, instead of the requested referral to a specialist.

87. Corizon employees at Corizon's Brentwood, Tennessee headquarters monitored specialist-referral activity for the individual primary-care providers working in Michigan prisons, including the number of specialist referrals requested by each medical provider, and the percentage of each provider's requests that were "ATP'd."

88. Corizon's corporate management used a data analytics tool, "ImpactPro," for its MDOC contract to continuously monitor performance. ImpactPro included easy-to-use strategic dashboards and opportunity reports, with data displayed to highlight key opportunities to reduce unnecessary costs.

89. Among these ImpactPro dashboards was a leaderboard of "top ten referring providers," which displayed the identities of the ten primary-care providers in Michigan prisons who made the most referrals to specialists, and the number of specialist referrals made by each of those providers.

90. Both a high ATP rate and a high number of referral requests were indicators of poor job performance for medical providers working in Michigan prisons.

24

Corizon's providers, such as Defendants Bohjanen and Kocha, were expected to request specialist referrals sparingly, and only when absolutely necessary.

91. Defendant Corizon's methods for monitoring and evaluating the performance of medical providers such as Bohjanen and Kocha caused Defendants Bohjanen and Kocha to hesitate prior to submitting requests for a specialty referrals for Michigan prisoners, such as Mr. Kelly.

92. While Defendant Kocha knew, on July 2, 2020, that Mr. Kelly's symptoms demonstrated a need for a CT urogram, regardless of the results of a "lab and UA recheck," Defendant Kocha elected to wait for those blood and urine test results before submitting his request for a referral to a specialist. Michigan providers were required to justify the medical necessity of the requested service in the request forms that they submitted to the Utilization Management department, and Defendant Kocha likely believed that updated urinalysis and bloodwork results would allow him to make a stronger case to Utilization Management that a referral to a specialist was medically-necessary for Mr. Kelly.

93. On July 29, 2020, Defendant Kocha belatedly requested a referral to a urologist for Mr. Kelly, to investigate the cause of the episode of gross hematuria that occurred two months prior, on May 28, 2020.

94. Defendant Kocha actually drew the inference that Mr. Kelly's gross hematuria could indicate cancer. He noted in his request that Mr. Kelly had denied experiencing fever or chills, which would be expected if the bloody urine was caused by an infection. He also wrote that the differential diagnosis, "would include bladder cancer so this does not need to be completed in 72 hours, though (if approved) it should not wait until covid is over."

95. Defendant Kocha's urology consult request was approved by Utilization Management on the same day he submitted it: July 29, 2020.

96. Defendants Kocha and Bohjanen's hesitation to submit a request to refer Mr. Kelly to a urologist, after he presented with gross hematuria in the context of a recent hospitalization for a swollen and abnormal kidney, caused at least a two-month delay in the diagnosis of his cancer. Defendants Kocha and Bohjanen were both actually aware that Mr. Kelly's symptoms indicated possible cancer in the urinary system.

97. Defendants Kocha and Bohjanen were aware that Mr. Kelly's symptoms were not consistent with common, less-serious causes of gross hematuria, like kidney stones or infections. Yet they waited from May 29, 2020 until July 29, 2020 to make the referral request, even though for the entire two-month period, they

26

had all the information they needed to know that a referral to a specialist was necessary.

98. Although a urology referral was approved on July 29, 2020, for reasons that are not clear from the available medical records, Mr. Kelly was not actually seen by a specialist at any time before he was emergently hospitalized on September 17, 2020.

99. On August 20, 2020, Mr. Kelly was seen again by Defendant Kocha. Mr. Kelly reported "left testicle pain. He states it started about 5-7 days ago with a pain on the left side which seems to go up into the left abdomen."

100. Left-sided testicle pain extending up into the left abdomen can signify a problem with the left kidney. That is because the left gonadal vein, which drains deoxygenated blood from the left testicle in a male, branches off of the left renal vein, which drains blood from the left kidney.

101. Left-sided testicular pain that goes up into the abdomen or back should generally arouse suspicion for a tumor in the left kidney, since left-sided kidney tumors commonly compress the gonadal vein where it enters the renal vein.

102. Defendant Kocha decided to treat Mr. Kelly's testicular pain conservatively, with Motrin.

27

103.   Defendant Kocha examined Mr. Kelly again on August 31, 2020, for continued complaints of worsening left-sided testicular pain, with an enlarged left testicle. Defendant Kocha wrote that Mr. Kelly "is getting more referred pain into the abdomen" and that the pain was radiating "now into his left low back as well."

104.   Defendant Kocha told Mr. Kelly that the only possible cause of his symptoms was an STD, even though Mr. Kelly reported that he had not been sexually-active since entering prison in April of 2015. Defendant Kocha prescribed Bactrim, an antibiotic, but did not order any STD testing for Mr. Kelly, or any other follow-up testing to determine the cause of his worsening pain in his left testicle, left lower abdomen, and left lower back.

105.   On the evening of September 10, 2020, Mr. Kelly again reported visible blood in his urine. He reported three episodes of bloody urine in the previous 24 hours.

106.   On the evening of September 16, 2020 or early morning hours of September 17, 2020, Mr. Kelly reported sharp, stabbing pain in his bladder area and an inability to urinate. He had blood clots blocking his urethra, so he could not empty his bladder. A nurse who was on duty that night ordered him transported to the ER.

28

107.   Mr. Kelly underwent an emergency CT scan of his lower torso at Marquette
General Hospital at approximately 1:35 AM on the morning of September 17,
2020. An on-call radiologist, Dr. Erik Richter, interpreted the scan at
approximately 3:49 AM that morning.

108.   Dr. Richter's report indicated that the CT scan showed "difficult to exclude
mass in the lower pole of the left kidney measuring at least 6.4 cm." He
summarized his findings as: "Grossly abnormal appearance of the left kidney
with blood in the urinary bladder. Findings could relate to lower pole mass in
addition to possible underlying severe infectious process."

109.   Mr. Kelly was seen by Dr. Michael Harris, a urologist, at the ER in
Marquette approximately twelve hours after the CT scan was performed. Dr.
Harris issued a provisional diagnosis of, "left renal tumor suspicious for locally-
advanced urothelial cancer vs. RCCA [renal cell carcinoma]."

110.   On September 17, 2020, Dr. Harris informed Defendant Kocha that Mr.
Kelly had a kidney tumor which was likely cancerous, and that he required a
nephrectomy, which is a surgical procedure to remove a kidney.

111.   ER providers catheterized Mr. Kelly on September 17, 2020, but the volume
of clotted blood in his bladder was so dense that were not able to evacuate all of
the urine even with a catheter. Dr. Harris scheduled Mr. Kelly for an emergent

29

cystoscopy with clot evacuation, which is a surgical procedure to remove the clotted blood from the bladder. The cystoscopy with clot evacuation was performed the following day, September 18, 2020.

112. On September 22, 2020, Defendant Kocha submitted an urgent request to Corizon's Utilization Management department for a follow-up urology appointment for Mr. Kelly, in order to develop a definitive plan for his left kidney.

113. The request was approved, but Mr. Kelly did not see Dr. Harris again. Instead, the following day, he was transported hundreds of miles away to an MDOC facility in Jackson, Michigan.

### III. Defendants Corizon, Ghasemi, and Alford

114. At all times relevant to this action, Defendant Corizon had the ability to request transfers of Michigan prisoners to different facilities for medical purposes. Corizon and the MDOC jointly maintained a policy of housing all prisoners expected to need extensive medical treatment in facilities in the vicinity of Jackson, Michigan.

115. Placing prisoners in need of extensive medical treatment in one geographic location afforded a financial benefit to Defendant Corizon, because it enabled

Corizon to negotiate lower reimbursement rates with certain preferred hospitals and specialty care providers.

116.   Across the American healthcare system, patients do not typically purchase medical services directly from healthcare providers. Instead, patients (or more commonly, their employers) purchase health insurance plans from third-party entities, such as HMOs, which in turn pay the healthcare provider when the patient receives a service. In healthcare-industry parlance, the entities that actually pay the providers for their services are called "payers," and the published lists of prices of the providers' services are called, "charge-masters."

117.   Payers usually negotiate discounts with providers, whereby the provider agrees to accept some discounted percentage of its charge-master prices to treat the members of the payer's plan, in exchange for the payer including the provider in its "network." The payer's network is a list of medical service providers that the payer steers its members towards. Payers may steer their members to in-network providers by prohibiting members from using their insurance benefits outside of the network, by charging higher co-pays when a member chooses an out-of-network provider, or by some combination of similar incentives.

118.   Generally, larger payers, i.e., those with more covered patients, are able to negotiate deeper discounts with providers. When a payer covers a large percentage of the patient population in a given geographic area, the payer has substantial leverage with local providers. Providers negotiating with a dominant payer stand to lose a large volume of business if they are excluded from the dominant payer's network.

119.   Once a payer has built out a network by negotiating discounts with a large number of providers, it will sometimes "rent" its network to other payers. In these arrangements, the "network landlord" payer will include a clause in all of its contracts with providers obligating the providers not only to accept the negotiated discounted rates when providing treatment to patients enrolled in the "network landlord" payer's healthcare plan, but also to treat patients in its designated "network lessee" plans at the same discounted rates. The "network tenant" payers, which are typically smaller, then pay a "network rental fee" to the "network landlord" payer, in exchange for the right to refer their members to providers in the "network landlord" payer's network, and to reimburse those providers at the discounted rate negotiated by the "network landlord" payer.

120.   At all times relevant to this action, Blue Cross Blue Shield of Michigan ("BCBSM") was by far the dominant market participant in the commercial

32

health insurance market in Michigan. In 2020, BCBSM held approximately 43% of Michigan's HMO market. The vast majority of providers, and every hospital in Michigan, were included in BCBSM's network.

121.  At all times relevant to this action, Defendant Corizon participated in a network rental agreement with BCBSM. Per the network rental agreement, Corizon had the right to send Michigan prisoners to providers in the BCBSM network, and to pay those providers at the discounted rates negotiated by BCBSM.

122.  In areas far away from Jackson, Michigan, such as Marquette in the Upper Peninsula, Defendant Corizon sent prisoners to providers in the BCBSM provider network and reimbursed the providers at BCBSM-negotiated rates.

123.  However, Corizon also negotiated its own contracts with certain providers in the vicinity of Jackson, Michigan. These deals afforded Corizon discounts that were even deeper than the discounts that BCBSM had negotiated with those same providers.

124.  Corizon was a much smaller payer than BCBSM, having less than 50,000 individuals in its prisoner plan at all relevant times. But despite its much smaller size, Corizon was able to negotiate better discounts than BCBSM with

certain Jackson-area providers, because of its superior ability to steer patients to specific providers.

125.   Corizon was able to direct all inmates in need of extensive medical services to the Jackson area, and assign all of them to the same few local providers. The main providers that Corizon used in the Jackson area were Henry Ford Allegiance Health in Jackson and McLaren Greater Lansing in Lansing. For urology-related services, Corizon contracted directly with Capitol Urological Associates in Okemos. Urology constituted a substantial portion of Corizon's specialty-care spending, because much of Corizon's specialty care spending was driven by oncology patients, and patients with prostate cancer accounted for over half of the oncology patients incarcerated in the MDOC.

126.   The providers that contracted directly with Corizon did not need to worry about losing a prisoner-patient if they could not schedule the prisoner-patient quickly. Unlike a member of a typical commercial health insurance plan, who is likely to establish care at a different in-network provider if she cannot obtain a timely appointment, members of Corizon's prisoner plan had no ability to choose from among several competing providers. Prisoners only went to the specific providers that Defendant Corizon selected for them.

127.   MDOC employees, rather than Corizon employees, were responsible for scheduling the off-site medical appointments for prisoners. But Corizon exercised control over *which* off-site providers the MDOC schedulers could use. Corizon directed the MDOC schedulers to schedule prisoners only with the providers with whom it had negotiated direct contracts whenever the prisoner was housed in a facility within reasonable driving distance of these providers. If the prisoner was not within reasonable driving distance, and Defendant Corizon became aware that the prisoner would require extensive medical services, Corizon would have the prisoner transferred to a correctional facility close to its preferred providers.

128.   In accordance with this policy, upon becoming aware in September of 2020 that Mr. Kelly had kidney cancer and needed a nephrectomy, Corizon terminated Mr. Kelly's treatment with Dr. Harris in Marquette and had him transferred to the Jackson area, where he was steered to Corizon's preferred urology provider, Capital Urological Associates.

129.   Starting on or about September 23, 2020, Mr. Kelly was housed in Duane Waters Health Center, a health center located inside of a prison complex in Jackson, Michigan. At Duane Waters, Mr. Kelly's assigned primary-care providers were Defendants Danielle Alford, PA and Leila Ghasemi, NP.

130.    Defendant Ghasemi saw Mr. Kelly on September 24, 2020. She immediately submitted a referral request to send him to Capital Urological Associates, writing, "He supposed to follow up with urology urgently in Marquette but he was transferred to DWH and needs 407 for Consult Vs Follow up."

131.    Defendant Ghasemi's referral request was approved by Corizon's Utilization Management department the same day. But the visit to Capital Urological did not take place until October 6, 2020, two weeks after the request was placed, and nineteen days after Mr. Kelly's presumptive diagnosis in Marquette of either urothelial cancer or renal cell carcinoma.

132.    Mr. Kelly was transported to Capital Urological Associates in Okemos on October 6th, but he was not examined by a urologist on that date.

133.    Mr. Kelly was not seen by a specialist on October 6th, 2020 because Defendants Ghasemi and Alford forgot to give the transport officer a CD containing Mr. Kelly's CT imaging from Marquette General Hospital. As a result, the medical professionals at Capital Urological Associates could not review Mr. Kelly's recent imaging study results, so they did not proceed with the appointment. Mr. Kelly was returned to Duane Waters Health Center without seeing a doctor.

36

134. The appointment was rescheduled for October 15, 2020. This time, Defendants Ghasemi and/or Alford made sure they gave the CD to the transport officer.

135. At the October 15th appointment, an ultrasound of the left kidney was performed. It revealed a mass in the lower pole, measuring 1.7 x 7.1 x 6.9 cm, that "looks malignant." Dr. Stockall, a urologist, also reviewed the CT scan images from Marquette. He determined that Mr. Kelly would require a nephrectomy with possible renal vein thrombectomy (surgical removal of a thrombus in the renal vein) as soon as possible.

136. Dr. Stockall planned to remove Mr. Kelly's kidney himself. He spoke to Defendant Ghasemi on the phone shortly after the October 15th appointment. He told her that he needed to perform the surgery ASAP, but needed an MRI with and without contrast for surgical planning purposes.

137. Dr. Stockall needed the MRI to determine if there was a tumorous thrombus in the left renal vein, and if so, how far it extended into the vein. A thrombus is a foreign object in a blood vessel. In this case, a tumorous thrombus in the left renal vein would be a blob of tumor tissue growing out of the kidney and into the renal vein. If this thrombus was present, and extended all the way down the renal vein into the inferior vena cava, a vascular surgeon would need to

participate in the surgery and the surgical methods used to remove the cancer would be different.

138. The inferior vena cava is the largest vein in the human body. It allows deoxygenated blood from the legs and lower torso to flow back to the heart. The left renal vein runs from the left kidney to the inferior vena cava.

139. Defendant Ghasemi submitted a request to Corizon's Utilization Management department for an "ASAP/Stat" MRI on October 20, 2020, and it was approved the same day. A request for the nephrectomy surgery was approved the following day.

140. When a physician requests a "stat" MRI, it is usually performed in a matter of hours, not a matter of days, and certainly not weeks later. Hospitals with Level I and Level II trauma centers have imaging suites that are staffed 24/7, with radiologists continuously on-call to interpret the images and provide results. For example, when Mr. Kelly was sent to the ER in Marquette just after midnight on September 17, 2020, and an ER physician requested a stat CT scan, the scan was performed by an on-duty team at approximately 1:35 AM and interpreted by an on-call radiologist before 4:00 AM.

141. However, in October of 2020, over a month after Dr. Harris' presumptive diagnosis of kidney cancer on the basis of that Marquette CT scan, Dr.

38

Stockall's request for an ASAP/STAT MRI was not scheduled with the same urgency. Defendant Ghasemi and the MDOC scheduler only attempted to schedule the MRI with Corizon's two preferred providers: Henry Ford Allegiance Health and McLaren Greater Lansing.

142.   Henry Ford Allegiance Health and McLaren Greater Lansing each have only one hospital-based MRI unit, and both hospitals reported that their unit was booked up for at least a week. An appointment was made at McLaren Greater Lansing for Mr. Kelly for November 4, 2020, two weeks after the STAT MRI was approved by Corizon's Utilization Management department.

143.   Other providers with MRI capabilities were located within driving distance of the Jackson prison complex. Some of these providers were closer to the complex than McLaren Greater Lansing, which is approximately 41 minutes away by car.

144.   MRI services were available at St. Joseph Mercy Chelsea Hospital, located at 775 S. Main St. in Chelsea, Michigan, which is approximately 25 minutes by car from the Duane Waters Health Center. The St. Joseph Mercy Health System is included in the BCBSM provider network.

145.   MRI services were available at Bronson Battle Creek Hospital, located at 300 North Ave in Battle Creek, Michigan, which is approximately 49 minutes

by car from the Duane Waters Health Center. Bronson Battle Creek Hospital is included in the BCBSM provider network.

146. MRI services were available at Edward W. Sparrow Hospital, located at 1215 E. Michigan Ave. in Lansing, Michigan, which is less than three miles from McLaren Greater Lansing, the facility that Mr. Kelly was actually transported to for his MRI. Edward W. Sparrow Hospital is included in the BCBSM provider network.

147. MRI services were available at Oaklawn Hospital, located at 200 N Madison St. in Marshall, Michigan, which is approximately 35 minutes by car from the Jackson prison complex. Oaklawn Hospital is included in the BCBSM provider network.

148. MRI services were available at the Emma L. Bixby Medical Center, located at 818 Riverside Ave. in Adrian, Michigan, which is approximately 51 minutes by car from the Jackson prison complex. The Emma L. Bixby Medical Center is included in the BCBSM provider network.

149. MRI services were available at Hillsdale Community Health Center, located at 168 S. Howell St. in Hillsdale, Michigan, which is approximately 48 minutes by car from the Jackson prison complex. The Hillsdale Community Health Center is included in the BCBSM provider network.

150.   The largest concentration of MRI machines in the State of Michigan is located in Ann Arbor, Michigan, at the University of Michigan Health System, approximately 43 minutes by car from the Jackson prison complex. The U of M Health System main campus has eight adult MRI machines and three dedicated pediatric MRI machines. The University of Michigan Health System also has two additional MRI units at a satellite facility on Plymouth Rd. in Ann Arbor. The University of Michigan Health System is included in the BCBSM provider network.

151.   No attempt was made to schedule Mr. Kelly's MRI at any of these nearby facilities. In the third and fourth quarters of 2020, pursuant to Corizon's policy of steering patients to its preferred providers, inmates in the Jackson-area prisons were only referred to the MRI units at Henry Ford Allegiance Health and McLaren Greater Lansing.

152.   As part of their contractual agreements with Corizon and/or MDOC, Henry Ford Allegiance Health and McLaren Greater Lansing built "secured units" inside of their hospitals. A "secured unit" is a wing of a hospital built out with architectural security features such that it resembles a prison, so that it is difficult for a person inside the secured unit to escape.

41

153.    When a prisoner needs to stay overnight at a community hospital without a secured unit, corrections officers must remain at the hospital with the prisoner. This can cause the MDOC to incur overtime expenses. But when the prisoner is receiving overnight treatment at a hospital with a secured unit, corrections officers can drop the prisoner off in the secured unit and leave.

154.    Secured units result in significant labor-cost savings for MDOC when a prisoner needs to be hospitalized for an extended period of time. But they are of little to no benefit when the prisoner is receives treatment on an outpatient basis, since the corrections officers will need to remain with the patient anyway to drive him back to the prison once the appointment is over. Corrections officers also need to remain with prisoner-patients while they receive treatment in areas of McLaren Greater Lansing or Henry Ford Allegiance Health that are outside of the secured-unit wings of those facilities.

155.    The MRI machines at Henry Ford Allegiance Health and McLaren Greater Lansing are not located inside of the secured units.

156.    Corizon's policy of only referring patients in the Jackson area to its preferred providers, even when a patient requires urgent treatment or diagnostic testing that Corizon's preferred providers cannot accommodate in a timely manner, caused repeated delays in the treatment of Mr. Kelly's cancer.

42

157.   On November 4, 2020, Mr. Kelly was transported by state vehicle to McLaren Greater Lansing to receive the MRI.

158.   The November 4, 2020 MRI showed that the tumor in the lower pole of the left kidney had grown, to approximately 6.5 x 7.6 x 6.2 cm. Still, no metastases were visible outside of the left kidney. There was "evidence of thrombosis of the left renal vein without extension into the inferior vena cava."

159.   Dr. Stockall reviewed the MRI images himself. He determined that the thrombus in the left renal vein was very close to the inferior vena cava, and that he needed an abdominal CT angiogram prior to surgery to examine the extent of the left renal vein thrombus and definitively rule out inferior vena cava involvement.

160.   On November 10, 2020, Defendant Ghasemi requested approval for the abdominal CT angiogram from Corizon's Utilization Management department.

161.   On November 11, 2020, Corizon's Utilization Management department approved the request for the abdominal angiogram.

162.   On November 12, 2020, an MDOC medical scheduler, Jen Bendele, faxed a request to schedule the appointment for the abdominal angiogram to McLaren Greater Lansing.

163.   The procedure was scheduled for November 23, 2020, thirteen days after the procedure was approved by Corizon's Utilization Management department, at McLaren Greater Lansing.

164.   No attempt was made to schedule the procedure sooner at any other nearby hospital.

165.   On November 17, 2020, a mass testing of prisoners for COVID-19 was conducted at Duane Waters Health Center.

166.   On November 20, 2020, the results of Mr. Kelly's November 17, 2020 COVID-19 test came back positive. Mr. Kelly was asymptomatic at the time, and he never developed noticeable symptoms of COVID-19.

167.   Because of the positive COVID-19 test result, Mr. Kelly's November 23, 2020 appointment at McLaren Greater Lansing for an abdominal CT angiogram was canceled.

168.   On November 27, 2020, ten days after his positive test, Mr. Kelly was discharged from the COVID isolation unit at Duane Waters Health Center. He had been able to urinate unassisted since October 15, 2020, so his providers at Duane Waters deemed him suitable for transfer to a regular prison. He was transferred to the Robert G. Cotton Correctional Facility in Jackson, Michigan the same day.

169.   The abdominal CT angiogram procedure was rescheduled for December 15, 2020 at McLaren Greater Lansing, eighteen days after Mr. Kelly was released from COVID quarantine and thirty-four days after the procedure had been approved by Corizon's Utilization Management department.

170.   In accordance with Corizon's policy of steering all patients to its preferred providers, no one attempted to make an appointment earlier than December 15, 2020 at any of the other nearby BCBSM-network medical facilities capable of performing an abdominal CT angiogram.

171.   When the abdominal CT angiogram requested by Dr. Stockall was canceled and then rescheduled, someone made a mistake: the imaging procedure that was ordered for the new appointment on December 15, 2020 was a *CT abdomen with IV contrast*, not an *abdominal CT angiogram*.

172.   The identity of the person who caused the wrong procedure to be ordered is not apparent from the available medical records. McLaren Greater Lansing has a record of a fax sent by MDOC medical scheduler Jan Bendele on November 12, 2020, requesting an "abdominal angiogram." But the McLaren Greater Lansing records for Mr. Kelly do not contain a faxed request for the December 15, 2020 appointment.

## IV. Defendants Corizon and Yarid

173.   Upon his transfer to the Robert G. Cotton Correctional Facility, Mr. Kelly's primary-care provider became Defendant Dr. Ravi Yarid.

174.   On December 10th, 2020, staff at Capital Urological Associates started calling the medical staff at the prison facilities in Jackson to find out what was going on with Mr. Kelly. Someone from Capital Urological Associates spoke to Defendant Yarid, and requested to see Mr. Kelly for a final pre-operative follow-up appointment.

175.   On December 10, 2020, Defendant Yarid submitted a request to Corizon's Utilization Management department for a pre-operative follow-up appointment at Capital Urological Associates. The request was approved the following day.

176.   For reasons that are not clear from the available medical records, Mr. Kelly was never brought back to Capital Urological Associates for the approved pre-operative follow-up appointment.

177.   On December 15, 2020, Mr. Kelly was transported to McLaren Greater Lansing, where he received a CT scan of the abdomen with IV contrast instead of an abdominal CT angiogram. The CT abdomen with IV contrast did not reveal sufficient detail about the extent of the tumor thrombus in the renal vein.

46

178.  The results of the December 15, 2020 CT scan of the abdomen with IV contrast were apparently not even transmitted to Capital Urological Associates, because Capital Urological Associates' records for Mr. Kelly do not contain a copy of the December 15, 2020 imaging study.

179.  Between November 27, 2020 and February 21, 2021, Defendant Yarid never saw Mr. Kelly for an appointment.

180.  On January 7, 2021, James Clapper, a P.A. from Capital Urological Associates, spoke with Defendant Yarid on the phone regarding Mr. Kelly. Mr. Clapper told Defendant Yarid that Mr. Kelly's situation has become more urgent as delays have mounted and the nephrectomy needs to be done ASAP. Mr. Clapper explained that there is a thrombus in the renal vein of unknown extent, and that the extent of the thrombus must be determined as soon as possible so that surgery can be performed.

181.  In a request he submitted to Corizon's Utilization Management department for approval of yet another imaging procedure on the basis of this conversation, Defendant Yarid wrote that Mr. Clapper "was adamant that this needs done URGENTLY as this procedure has been significantly delayed and the stability of the thrombus is unknown."

47

182.   "The stability of the thrombus" refers to the possibility that the thrombus could break off of the main tumor in the kidney and start moving up the inferior vena cava. If this happened, the thrombus would be very likely to block the flow of deoxygenated blood back through Mr. Kelly's heart, causing Mr. Kelly to die in a matter of minutes.

183.   The request that Defendant Yarid submitted on January 7, 2021 was for a venacavagram. The request for a venacavagram was approved by Corizon's Utilization Management department the same day. But again, it was the wrong imaging study. While Dr. Stockall needed to see if the tumorous thrombus extended from the renal vein into the inferior vena cava, but he had not requested a "venacavagram." The study Dr. Stockall asked for was an *abdominal CT angiogram.*

184.   When an attempt was made to schedule a venacavagram, someone at the radiology department at McLaren Greater Lansing realized it was the wrong imaging study. On or about February 2, 2021, the McLaren Greater Lansing radiology department called Capital Urological Associates. PA Clapper from Capital Urological Associates then called Defendant Yarid, and told him to request an *abdominal CT angiogram.*

48

185.   On February 2nd, 2021, Defendant Yarid submitted a request to Corizon's Utilization Management department for an abdominal CT angiogram for Mr. Kelly. The request was approved the same day.

186.   An appointment for an abdominal CT angiogram was made at McLaren Greater Lansing for February 18, 2021. Again, pursuant to Corizon's policy of steering all patients to its preferred providers, no one attempted to make an earlier appointment for this service at any other nearby hospital.

187.   On February 18, 2021, Mr. Kelly underwent an abdominal CT angiogram. It revealed that the cancer had now spread to his liver and left adrenal gland, and possibly to his lungs. It was now too late for curative surgery.

188.   In notes he placed in Mr. Kelly's electronic medical record, Defendant Yarid attributed the "extensive delays" in treating Mr. Kelly's cancer to "other medical complications and COVID chaos."

189.   However, while Defendant Corizon served as the contracted healthcare provider for the MDOC, extensive delays in the provision of necessary surgeries for prisoners were the rule, not the exception. Other patients suffered similar extensive delays in receiving diagnostics and treatment both before and after 2020.

190. For example, Ronnie Fritz, another inmate housed the Robert G. Cotton Correctional Facility in 2021, also had renal cell carcinoma. He experienced similar extensive delays in access to care.

191. Mr. Fritz reported bloody urine and right flank pain on December 26, 2020. Just like in Mr. Kelly's case, a request to refer him for specialty care (in his case, the first request was for a CT scan) was not submitted until months later, on April 29, 2021.

192. The CT scan for Mr. Fritz was approved by Corizon's Utilization Management department on April 30, 2021, but the appointment did not occur until July 22, 2021, eighty-four days after approval.

193. After the CT scan on revealed a large tumor in Mr. Fritz' right kidney suspicious for malignancy, it took twenty-seven days between Utilization-Management approval and performance of the service for a kidney ultrasound at Capital Urological Associates, and thirty-seven days between approval and performance for a CT urogram.

194. In total, it took eleven months to definitively diagnose Mr. Fritz with renal cell carcinoma from the time he first presented with visible blood in his urine.

195. These delays are not reflective of the amount of time it normally takes to diagnose and treat cancer in Michigan. A physician hired by the Fritz family to

review the care provided to him in MDOC concluded, "it took 11 months to determine a diagnosis of Renal Cell Carcinoma when it should have been diagnosed within the first month of Mr. Fritz presentation of hematuria." (**Ex. D: Opinion of Dr. Sherry O'Donnell, D.O.**).

196.   Mr. Fritz was paroled from the MDOC on December 22, 2021. He did not receive a nephrectomy at any point while in MDOC custody. But after he was released, he was able to establish care at a new provider in Grand Rapids, undergo all necessary pre-operative testing, and have his kidney removed within approximately one week.

197.   Corizon's policy of steering all patients requiring extensive medical care to its preferred providers in the Jackson area, Henry Ford Allegiance Health and McLaren Greater Lansing, caused similar excessive delays in performing surgeries long before COVID-19. (**See Ex. E: Email from Jennifer Dalton, N.P. to Dr. Keith Papendick, November 9, 2016**).

**COUNT I: Deprivation of Rights Guaranteed by the Eighth Amendment to the United States Constitution Through Deliberate Indifference to Serious Medical Needs**

**(Defendants Corizon/Quality Correctional Care of Michigan, P.C., Kocha, Bohjanen, Alford, Ghasemi, and Yarid)**

51

198.   At all times relevant to this action, Defendants Corizon/Quality Correctional Care of Michigan, P.C., Kocha, Bohjanen, Alford, Ghasemi, and Yarid acted under color of state law when they provided medical care to incarcerated individuals, including the Plaintiff.

199.   Renal cell carcinoma is a serious medical need.

200.   When Defendant Kocha became aware that Plaintiff exhibited gross hematuria on or about May 29, 2020, but did not experience any pain or burning sensations while urinating, Defendant Kocha actually drew the inference that these symptoms could indicate kidney or bladder cancer.

201.   When Defendant Bohjanen became aware that Plaintiff exhibited gross hematuria on or about May 29, 2020, but did not experience any pain or burning sensations while urinating, Defendant Bohjanen actually drew the inference that these symptoms could indicate kidney or bladder cancer.

202.   Defendant Bohjanen wrote in Mr. Kelly's electronic medical record that Mr. Kelly had a request pending for a consultation with urology "to rule out bladder neoplasm."

203.   Defendants Bohjanen and Kocha delayed requesting a urology consultation for Mr. Kelly for two months after he exhibited gross hematuria, from May 29, 2020 until July 29, 2020.

204.   Defendants Bohjanen and Kocha received no new information about Mr. Kelly's condition between May 29, 2020 and July 29, 2020 indicating that a urology consult had become more urgent.

205.   When Defendants Bohjanen and Kocha waited two months before making the request to send Mr. Kelly to a urologist, they consciously exposed Mr. Kelly to a risk of serious harm.

206.   Defendants Bohjanen and Kocha hesitated to request a urology consultation, waiting for additional lab results or the appearance of new symptoms, because of a policy or custom of Defendant Corizon of discouraging providers from requesting specialty-care consultations unless absolutely necessary, and a policy requiring providers to justify the medical necessity of their specialty-care referrals to Corizon's Utilization Management department.

207.   These policies or customs were the 'moving force' behind Defendants' Bohjanen and Kocha's decision to wait two months before making a referral request to a specialist to investigate the cause of Plaintiff's gross hematuria.

208.   After a second CT scan was performed at Marquette General Hospital on September 17, 2020, Plaintiff's various Corizon providers, including Defendants Ghasemi, Alford, and Yarid, became aware that Mr. Kelly had a tumor in his left kidney that was likely malignant.

209.   Defendants Ghasemi, Alford, and Yarid knew that cancer needs to be treated quickly, and that if it is not treated, it will usually spread throughout the body and kill the patient.

210.   Between September 24, 2020 and November 27, 2020, Defendants Ghasemi and Alford were Plaintiff's primary-care providers, and were responsible for coordinating the treatment of Plaintiff's presumed kidney cancer.

211.   Between November 27, 2020, and his release on parole on July 7, 2021, Defendant Yarid was Plaintiff's primary-care provider, and was responsible for coordinating the treatment of Plaintiff's presumed kidney cancer.

212.   Defendants Ghasemi, Alford, and Yarid made no effort to schedule appointments for Plaintiff for cancer-related care at any providers other than, a) Capital Urological Associates, b) McLaren Greater Lansing, or c) Henry Ford Allegiance Health, even when these providers were not able to perform the required services within the necessary timeframe.

213.   Defendants Ghasemi, Alford, and Yarid did not look beyond these three providers because of a custom, policy or practice of Defendant Corizon to steer all prisoner-patients to those few providers with whom Defendant Corizon had negotiated charge-master discounts that were deeper than the discounts negotiated by Blue Cross Blue Shield of Michigan.

54

214.   Defendant Corizon's custom, policy or practice of steering all prisoner-patients to its preferred providers was the moving force behind a series of delays in treating Plaintiff's cancer.

215.   When Defendants Ghasemi, Alford, and Yarid failed to arrange for sufficiently prompt treatment for Plaintiff, for example, by scheduling a STAT MRI for fifteen days later, they consciously exposed Plaintiff to an unreasonable risk of serious harm.

216.   Through their aforementioned acts and omissions under color of state law, Defendants Corizon, Quality Correctional Care of Michigan, P.C., Kocha, Bohjanen, Ghasemi, Alford, and Yarid deprived Plaintiff of his federal right, protected by the Eighth Amendment to the United States Constitution, to be free from cruel and unusual punishment.

## COUNT II: Common-Law Negligence

### (Defendants Ghasemi, Alford, Yarid, Quality Correctional Care of Michigan, P.C., and Corizon)

217.   On or about October 6, 2020, Defendants Ghasemi and Alford forgot to give a CD containing CT scan imaging results to the transport officer when Plaintiff was sent to his off-site appointment at Capital Urological Associates. As a result, diagnosis and treatment of Plaintiff's cancer was delayed by nine days.

218.   Between November 20, 2020 and November 27, 2020, Defendants Ghasemi and/or Alford cancelled Plaintiff's appointment for an abdominal CT angiogram, then reordered a different test with a similar name: a CT abdomen with IV contrast.

219.   On or about January 7, 2021, Defendant Yarid also submitted an off-site referral request for the wrong test: a venacavagram rather than an abdominal CT angiogram.

220.   As a result of Defendants Ghasemi and/or Alford and Yarid ordering the wrong imaging studies on these two occasions, Plaintiff's surgery was delayed by sixty-three days.

221.   Defendants Ghasemi, Alford, and Yarid owed the Plaintiff a duty of care when they coordinated his medical treatment, to send him to medical appointments with the records that specialists would need to render treatment, and to order the imaging study requested by the specialist, instead of a different imaging studies with similar names.

222.   Defendants Ghasemi, Alford, and Yarid breached their duties to the Plaintiff by sending him to the specialist without giving the CD to the transport officer, and by ordering the wrong imaging study on two occasions.

223. As a result, performance of an abdominal CT angiogram was delayed by a total of sixty-nine days, during which time Plaintiff's cancer metastasized beyond his left kidney. As a result, Plaintiff has suffered damages.

224. Defendant Corizon/Quality Correctional Care of Michigan, P.C. is vicariously liable for the aforementioned negligent acts of Defendants Ghasemi, Alford, and Yarid, because such acts were carried out within the scope of their employment by Defendant Corizon/Quality Correctional Care of Michigan, P.C.

## COUNT III: Medical Malpractice

### (Defendants Bostwick, Bohjanen, Kocha, Ghasemi, Alford, Yarid, Quality Correctional Care of Michigan, P.C., and Corizon)

225. Plaintiff incorporates all prior paragraphs by reference, as if fully set forth herein.

### A. Defendant Bostwick

226. Defendant Bostwick is a board-certified diagnostic radiologist.

227. Defendant Bostwick interpreted a CT scan of Plaintiff's abdomen on either March 19, 2020 or March 20, 2020.

228. When Defendant Bostwick interpreted the CT scan of Plaintiff's abdomen, he owed Plaintiff a duty of professional care, to act as a diagnostic radiologist

of ordinary judgment, learning, or skill would do under the same or similar circumstances.

229.  Under the circumstances, a diagnostic radiologist of ordinary judgment, learning, or skill would have read the CT scan taken of Plaintiff's abdomen on March 19, 2020 as containing a potentially-malignant mass in the left kidney.

230.  Defendant Bostwick instead interpreted the March 19, 2020 CT scan of Plaintiff's abdomen as showing an infarct in the lower pole of the left kidney.

231.  As a result of Defendant Bostwick's failure to interpret the CT scan as a diagnostic radiologist of ordinary judgment, learning, or skill would do, other medical providers treating the Plaintiff were led to believe that the Plaintiff had an infarct in his left kidney, rather than a tumor.

232.  As a result, the diagnosis of Plaintiff's renal cell carcinoma was delayed, allowing the cancer additional time to spread and grow.

233.  On account of the delay in diagnosing and treating his renal cell carcinoma, Plaintiff has suffered and will continue to suffer damages.


**B. Defendant Bohjanen**

234.  Defendant Bohjanen is a primary-care physician practicing medicine in Marquette, Michigan who is not board-certified in any specialty.


58

235.   Defendant Bohjanen examined Plaintiff after Plaintiff complained of gross hematuria.

236.   When Defendant Bohjanen treated Plaintiff, he owed Plaintiff a duty of professional care, to act as a primary care physician of ordinary judgment, learning, or skill practicing in Marquette, Michigan or a similar community would do under the same or similar circumstances.

237.   Under the circumstances, a primary care physician of ordinary judgment, learning, or skill practicing in Marquette, Michigan or a similar community, when presented with a patient with unexplained gross hematuria, would have initiated a prompt work up to determine the cause of the hematuria and rule out kidney or bladder cancer.

238.   Defendant Bohjanen instead ordered a PSA test and instructed Plaintiff to drink lots of fluids.

239.   As a result of Defendant Bohjanen's failure to initiate a prompt work up to determine the cause of the hematuria and rule out kidney or bladder cancer, Plaintiff's kidney tumor was not discovered until September 17, 2020.

240.   As a result, the diagnosis and treatment of Plaintiff's renal cell carcinoma was delayed, allowing the cancer additional time to spread and grow.

241. On account of the delay in diagnosing and treating his renal cell carcinoma, Plaintiff has suffered and will continue to suffer damages.

### C. Defendant Kocha

242. Defendant Kocha is a Physician's Assistant practicing in Marquette, Michigan.

243. Defendant Kocha examined Plaintiff after Plaintiff complained of gross hematuria.

244. When Defendant Kocha treated Plaintiff, he owed Plaintiff a duty of professional care, to act as a Physician's Assistant ordinary judgment, learning, or skill practicing in Marquette, Michigan or a similar community would do under the same or similar circumstances.

245. Under the circumstances, a Physician's Assistant of ordinary judgment, learning, or skill practicing in Marquette, Michigan or a similar community, when presented with a patient with unexplained gross hematuria, would have initiated a prompt work up to determine the cause of the hematuria and rule out kidney or bladder cancer.

246. Defendant Kocha delayed a work up to determine the cause of the gross hematuria for two months.

60

247.   Defendant Kocha examined Plaintiff on two occasions in August of 2020, for repeated complaints of worsening left-sided testicular pain extending into the abdomen and back. Plaintiff presented with these symptoms in the context of recent gross hematuria, and a hospitalization related to abnormal imaging findings on his left kidney.

248.   Under the circumstances, a Physician's Assistant of ordinary judgment, learning, or skill practicing in Marquette, Michigan or a similar community, when presented with a patient with repeated complaints of unexplained left-sided testicular pain extending up into the abdomen and lower back, with a recent history of gross hematuria and left-kidney problems, would have initiated a prompt work up to determine the cause of the left-sided testicular pain and rule out kidney or bladder cancer.

249.   As a result of Defendant Kocha's failure to initiate a prompt work up to determine the cause of the left-sided testicular pain and rule out kidney or bladder cancer, Plaintiff's kidney tumor was not discovered until September 17, 2020.

250.   As a result, the diagnosis and treatment of Plaintiff's renal cell carcinoma was delayed, allowing the cancer additional time to spread and grow.

61

**251.**   On account of the delay in diagnosing and treating his renal cell carcinoma, Plaintiff has suffered and will continue to suffer damages.

### D. Defendants Ghasemi and Alford

252.   Defendant Ghasemi is a Nurse Practitioner practicing in Jackson, Michigan, and Defendant Alford is a Physician's Assistant practicing in Jackson, Michigan.

253.   Defendants Ghasemi and Alford were Plaintiff's assigned primary-care providers between September 24, 2020 and November 27, 2020 and were responsible for coordinating the provision of medical care to Plaintiff during that time period.

254.   When Defendants Ghasemi and Alford treated Plaintiff, they had a duty to act as a Nurse Practitioner and a Physician Assistant of ordinary judgment, learning, or skill practicing in Jackson, Michigan or a similar community would act under the same or similar circumstances.

255.   Under the circumstances, a Nurse Practitioner or a Physician Assistant of ordinary judgment, learning, or skill practicing in Jackson, Michigan or a similar community would ensure that a patient with a suspected malignant tumor in his kidney received prompt diagnostic imaging and surgical treatment as recommended by consulting specialists, including a nephrectomy within approximately one week. If the necessary care could not be coordinated with

sufficient haste on an outpatient basis, a Nurse Practitioner or a Physician Assistant of ordinary judgment, learning, or skill practicing in Jackson, Michigan or a similar community would order the patient transferred to a tertiary medical center as an inpatient to complete pre-operative testing and surgery.

256.   As a result of Defendants Ghasemi and Alford's failure to act as a Nurse Practitioner or a Physician Assistant of ordinary judgment, learning, or skill practicing in Jackson, Michigan or a similar community would act under the circumstances, Plaintiff did not receive a nephrectomy between September 24, 2020 and November 27, 2020.

257.   As a result, definitive treatment of Plaintiff's renal cell carcinoma was delayed for over two months, allowing the cancer additional time to spread and grow.

258.   On account of the delay in diagnosing and treating his renal cell carcinoma, Plaintiff has suffered and will continue to suffer damages.

**E. Defendant Yarid**

259.   At all times relevant to this matter, Defendant Yarid was a primary-care physician practicing in Jackson, Michigan who was not board-certified in any specialty.

63

260.   From November 27, 2020 to July 7, 2021, Defendant Yarid was Plaintiff's assigned primary-care physician, and was responsible for coordinating the treatment of his kidney cancer.

261.   When Defendant Yarid treated Plaintiff, he had a professional duty to act as a primary-care physician of ordinary judgment, learning, or skill practicing in Jackson, Michigan or a similar community would act under the same or similar circumstances.

262.   Under the circumstances, a primary care physician of ordinary judgment, learning, or skill practicing in Jackson, Michigan or a similar community would ensure that a patient with a suspected malignant tumor in his kidney received prompt diagnostic imaging and surgical treatment as recommended by consulting specialists, including a nephrectomy within approximately one week. If the necessary care could not be coordinated with sufficient haste on an outpatient basis, a primary care physician of ordinary judgment, learning, or skill practicing in Jackson, Michigan or a similar community would order the patient transferred to a tertiary medical center as an inpatient to complete pre-operative testing and surgery.

263.   As a result of Defendant Yarid's failure to act as a primary care physician of ordinary judgment, learning, or skill practicing in Jackson, Michigan or a similar

community would act under the circumstances, Plaintiff did not receive a nephrectomy between November 27, 2020 and February 18, 2021, at which point the cancer had progressed to Stage IV and curative surgery was no longer possible.

264.   As a result of the failure to perform surgery within the time period when it could have cured his cancer, Plaintiff has suffered and will continue to suffer damages.

**F. Defendant Corizon/Quality Correctional Care of Michigan, P.C.**

265. Defendant Corizon/Quality Correctional Care of Michigan, P.C. is vicariously liable for the professional malpractice of Defendants Bohjanen, Kocha, Ghasemi, Alford, and Yarid, because their acts and omissions occurred within the scope of their employment by Defendant Corizon/Quality Correctional Care of Michigan, P.C.

266.   Defendant Corizon/Quality Correctional Care of Michigan, P.C. is also directly liable for its own professionally-negligent acts and omissions to the extent those acts and omissions delayed treatment of Plaintiff's cancer, such as its policies limiting the providers to whom its employees can refer patients, and its policy of requiring pre-approval by its Utilization Management department for each

specialty service, its policy of transferring all prisoners in need of extensive medical services to the Jackson area, and its policy of discouraging its employees from referring patients to specialists.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, in whatever amount he is found to be entitled, including punitive damages, plus costs, interest and attorney's fees.

Dated: March 19, 2022

Respectfully submitted,

*/s/Ian T. Cross*
Ian T. Cross (P83367)
402 W. Liberty St.
Ann Arbor, MI 48103
(734) 994 - 9590
Attorney for Plaintiff

## **JURY DEMAND**

Plaintiff, by and through his attorneys, demands a jury trial in this case.

Dated: March 19, 2022

*/s/Ian T. Cross*
Ian T. Cross (P83367)
402 W. Liberty St.
Ann Arbor, MI 48103
(734) 994 - 9590
Attorney for Plaintiff

66