# Exhibit A

The following opinion is presented on-line for informational use only and does not replace the official version. (Mich Dept of Attorney General Web Site - www.ag.state.mi.us)

STATE OF MICHIGAN

FRANK J. KELLEY, ATTORNEY GENERAL

Opinion No. 6770

September 17, 1993

NONPROFIT CORPORATION ACT:

Providing medical care services through employed physicians

Nonprofit hospitals and other corporations incorporated under the Nonprofit Corporation Act may provide medical care services through employed physicians.

Honorable Kirk A. Profit

State Representative

The Capitol

Lansing, Michigan

You have asked a question which may be stated as follows:

> May nonprofit hospitals and other corporations incorporated under the Nonprofit Corporation Act provide medical care services through employed physicians?

Section 251(1) of the Nonprofit Corporation Act, 1982 PA 162, MCL 450.2101 et seq; MSA 21.197(101) et seq, provides:

> Except if required by law to incorporate under another statute of this state, a corporation may be formed under this act for any lawful purposes not involving pecuniary gain or profit for its officers, directors, shareholders, or members.

This provision establishes essentially three prerequisites for the formation of a nonprofit corporation in Michigan: (1) the corporation must be one which is not required to incorporate under another statute; (2) the purposes of the corporation must be lawful; and (3) the purposes of the corporation must not involve pecuniary gain or profit for its officers, directors, shareholders, or members. In analyzing these requirements, we must be cognizant of section 103 of the same statute which states, in pertinent part:

> This act shall be liberally construed and applied to promote its underlying purposes and policies which include:

> (b) To provide a general corporate form for the conduct of lawful nonprofit activities with such variations and modifications from the form as interested parties in any corporation may agree upon, subject only to overriding interests of this state and of third parties.

The first and third prerequisites established by section 251(1) clearly impose no barrier to the provision of medical services by a nonprofit corporation through employed physicians. As to the first prerequisite, the corporation must merely be one which is not required to incorporate under some other statute. The Legislature has, in fact, required certain nonprofit health care corporations to incorporate under specific acts. See, e.g., section 201(1) of the Nonprofit Health Care Corporation Reform Act, 1980 PA 350, MCL 550.1201(1); MSA 24.660(201)(1). However, research discloses no such provision applying to nonprofit hospitals and clinics. Thus, at least some nonprofit health care corporations would appear to meet this first prerequisite. Similarly, with respect to the third prerequisite, your question is limited by its terms to corporations which are nonprofit, i.e., those which are not established for the purpose of generating a profit for their officers, directors, shareholders, or members.

The second prerequisite, the requirement that the corporation be formed for a lawful purpose, poses the more difficult question. The answer to this question turns primarily upon an examination of the so-called learned professions doctrine.

OAG, 1979-1980, No 5676, p 700 (April 8, 1980), considered the learned professions doctrine and its rationale in the context of the practice of osteopathic medicine. The opinion stated, on pages 701-702:

> Traditionally, learned professions have not been permitted to practice as corporate entities by virtue of what is sometimes referred to as the "learned profession doctrine." A four-point rationale has been generally advanced as the basis for this doctrine:
>
> 1) Laymen should not be permitted, directly or indirectly by virtue of the corporate form, to practice medicine;
>
> 2) Necessary confidential and professional relationships existing between a physician and his patient could be destroyed by lay shareholders interested only in a profit;
>
> 3) The limited liability of the corporate form is not appropriate where the client must place such a high degree of trust and confidence in the physician; and
>
> 4) It is impossible for a corporation to fulfill the licensing and ethical requirements medical practice demands. 47 Journal of Urban Law 674, 685-686 (1969)
>
> It was an analysis of this doctrine, together with a survey of the doctrine's application in sister states, which led to the conclusion in II OAG, 1955-1956, No 2451, p 124 (March 7, 1956), that neither the practice of medicine nor the furnishing of osteopathic medical services was a lawful corporate purpose permitting formation of a corporation pursuant to business corporation statutes then in effect. The opinion held that it is not a lawful purpose of a corporation to contract with other persons to provide medical care through the officers, agents or employees of the corporation. See also United States v American Medical Association, 72 USAppDC 12; 110 F2d 703 (1940); cert den, 310 US 644; 60 SCt 1096; 84 LEd 1411 (1940); People by Kerner v United Medical Services, 362 Ill 442; 200 NE 157 (1936); 61 AmJur2d, Physicians, Surgeons and Other Healers, Sec. 15, 135. [ Footnotes omitted.]

This same four-point rationale was cited in OAG, 1989-1990, No 6592, p 166, 169 (July 10, 1989), as the principal basis for that opinion's conclusion that the learned professions doctrine applies to Michigan corporations formed under the Business Corporation Act, 1972 PA 284, MCL 450.1101 et seq; MSA 21.200(101) et seq, and that the doctrine precludes those for-profit corporations from engaging in activities, such as the practice of medicine, which may only be performed by one of the learned professions. [1] Your inquiry now requires an examination of whether the learned professions doctrine also extends to nonprofit corporations formed under the Nonprofit Corporation Act.

Research discloses no reported appellate decisions by Michigan courts addressing this question. However, a review of the literature on this subject reveals that the prevailing weight of authority in other states supports the conclusion that the doctrine extends only to for-profit corporations and has no application to nonprofit entities. As one commentator has observed:

> Even in its most robust period, the corporate practice doctrine was generally not applied to nonprofit organizations. It was believed that the policy concerns underlying the doctrine were largely vitiated when the profit motive was removed. [ Footnote omitted.]

Wiorek, The Corporate Practice of Medicine Doctrine, 8 J Legal Medicine 3, p 465, 469 (1987). See also, Hansmann, Reforming Nonprofit Corporation Law, 129 UPaLR 497, 539-540 (1981), which states:

> [T]he rule has generally been applied only to for-profit corporations. When confronted with a nonprofit corporation, the courts often put a policy gloss on the rule, arguing that its purpose is to prevent laymen from interfering with the physician-patient relationship, or to prevent "commercialization" of the practice of medicine. And these evils are only likely to arise, it is argued, when the physician is being supervised by a profit-seeking employer. The result is that the corporate practice rule has acted as a selective prohibition on the practice of medicine by for-profit, but not nonprofit, corporations. [ Footnotes omitted.]

Even in states such as California, where the doctrine has long been firmly established [see, Parker v Bd of Dental Examiners, 216 Cal 285, 296; 14 P2d 67, 72 (1932) ] and has recently been applied to for-profit corporations [see, California Ass'n of Dispensing Opticians v Pearle Vision, 143 CalApp3rd 419, 427; 191 CalRptr 762, 768 (1983) ], nonprofit corporations such as hospitals and teaching institutions have been exempted. See, People ex rel State Bd of Medical Examiners v Pacific Health Corp Inc, 12 Cal2d 156, 160; 82 P2d 429, 431 (1938); cert den 306 US 633; 59 SCt 463; 83 LEd 1035 (1939), San Diego County v Gibson, 133 CalApp2d 519, 522; 284 P2d 501, 504 (1955), and Blank v Palo Alto-Stanford Hospital Center, 234 CalApp2d 377, 393; 44 CalRptr 572, 582 (1965).

Referring to nonprofit organizations, the Supreme Court of California stated in People ex rel State Bd of Medical Examiners v Pacific Health Corp Inc, supra, 82 P2d at p 431:

> Such activities are not comparable to those of private corporations operated for profit and, since the principal evils attendant upon corporate practice of medicine spring from the conflict between the professional standards and obligations of the doctors and the profit motive of the corporation employer, it may well be concluded that the objections of policy do

>not apply to nonprofit institutions.

In 1953 another California court held that a medical college providing services to a county hospital did not violate the corporate practice doctrine. The court stated:

> Basically, the rule against corporate practice of medicine is designed to protect the public from possible abuses stemming from commercial exploitation of the practice of medicine.

Los Angeles County v Ford, 121 CalApp2d 407; 263 P2d 638, 641 (1953).

Other jurisdictions have also contrasted profit and nonprofit organizations or cited the profit motive as the major reason for condemning the corporate practice of medicine. See, e.g., Bartron v Codington County, 68 SD 309; 2 NW2d 337, 346 (1942), Group Health Ass'n v Moor, 24 FSupp 445, 446 (DC, 1938), and Albany Medical College v McShane, 104 AD2d 119, 121; 481 NYS2d 917, 919 (1984), aff'd 66 NY2d 982; 499 NYS2d 377; 489 NE2d 1278 (1985). [2]

In addition to the public policy concern over the dangers of commercialization, the courts have cited the limited liability of the corporations as a basis for the prohibition against corporate practice of medicine. See OAG, 1979-1980, No 5676 at p 701. At least in Michigan, this concern has lost much of its force with respect to charitable and nonprofit organizations. In Parker v Port Huron Hospital, 361 Mich 1; 105 NW2d 1 (1960), the Michigan Supreme Court reexamined the rule of charitable immunity which had been adopted in 1894 and sustained since then. The Court held that a charitable nonprofit hospital organization should no longer be held immune for injuries to patients caused by the negligence of its employees. id., p 28 Thus the issue over the limited liability where a patient must place such a high degree of trust and confidence in the physician is not a concern in Michigan under Parker.

In summary, a review of Michigan case law reveals that the question of whether the learned professions doctrine applies to nonprofit corporations has never been directly addressed by Michigan's appellate courts. A survey of the doctrine's application in other states indicates that virtually all of the states facing this question have concluded that the the major public policy concerns underlying that doctrine--commercialization, lay control, and limited liability of the corporate form--are sufficiently addressed by formation as a nonprofit corporation and that, consequently, the doctrine does not apply to nonprofit corporations.

Of course, physicians employed by nonprofit hospitals and other non-profit corporations remain subject to all of the continuing licensure and standards of practice requirements imposed by the State of Michigan and the ethical codes of their professions. See part 170 of the Public Health Code, MCL 333.17001 et seq; MSA 14.15(17001) et seq, and part 175 of the same code, MCL 333.17501 et seq; MSA 14.15(17501) et seq.

It is my opinion, therefore, that nonprofit corporations incorporated under the Nonprofit Corporation Act may provide medical care services through employed physicians.

Frank J. Kelley

Attorney General

> (1 As noted in OAG, No 6592, the Professional Service Corporation Act, 1962 PA 192, MCL 450)221 et seq; MSA 21.315(1) et seq, authorize persons licensed to practice one of the learned professions to form for-profit corporations whose shareholders, officers, agents and employees providing professional services are all licensed in that profession; this statute specifically addresses each of the four points of the underlying rationale of the learned professions doctrine.

(2 In Garcia v Texas State Board of Medical Examiners 384 FSupp 434, 438 (WDTex, 1974), aff'd 421 US 995; 95 SCt 2391; 44 LEd2d 663 (1975), the federal courts upheld the constitutionality of a Texas statute that had the effect of prohibiting lay persons from establishing a nonprofit corporation to provide medical care) That result, however, was based not on the learned professions doctrine but on explicit statutory language that only allowed licensed doctors to establish nonprofit corporations to provide medical care.