UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SEVEN TRADE LLC,

                     *Plaintiff*,

      -against-

MEDICAL ENGINEERING LLC, LONNIE BANKS, VIKING SALES GROUP LLC, AND SHLOMO E. SUISSA,

                     *Defendants*.
------------------------------------------------------------------X

No. 7:22-cv-01673 (PMH)

**DECLARATION OF ISAAC LEFKOWITZ IN SUPPORT OF PROPOSED ORDER TO SHOW CAUSE FOR A DEFAULT JUDGMENT**

ISAAC LEFKOWITZ, hereby declares under penalty of perjury:

1. I am a director of the Plaintiff, Seven Trade LLC ("Plaintiff"), in this action. As such, I have personal knowledge of the facts and circumstances herein.

2. I submit this declaration in support of Plaintiff's motion pursuant to Fed. R. Civ. P. 55(b)(2) for an order entering a default judgment against Defendants Medical Engineering LLC ("Medical Engineering"), Lonnie Banks ("Banks"), Viking Sales Group LLC ("Viking"), and Shlomo E. Suissa ("Suissa") (collectively, "Defendants").

**A.    The Allegations in the Complaint**

3. As the fourth wave of the COVID-19 pandemic swept through the country in January 2022, Plaintiff agreed to provide COVID-19 self-test kits to its customer Corizon Health, Inc. ("Corizon Health"), a large healthcare company.

4. On January 18, 2022, on behalf of Plaintiff, I was introduced to Suissa, a purported COVID-19 self-test kit broker. During a telephone call that day between Suissa and me, Suissa represented to me that he was the head of Viking, and through Viking, had extensive experience in procuring large quantities of personal protective equipment and at-home COVID-19 test kits. I

advised Suissa that Plaintiff needed certain COVID-19 self-test kits to provide to Corizon Health and that time was of the essence to fulfill Corizon Health's order. Accordingly, Defendants were well aware that Plaintiff was purchasing the self-test kits for resale to a customer and that the only reason Plaintiff was purchasing the kits was to earn a profit on their resale. Suissa responded that he understood and represented to me that one of his industry contacts, Medical Engineering, had secured a large supply of COVID-19 self-test kits.

5. Later that day, Suissa set up a telephone call among me, Suissa, and Banks, who held himself out as the principal of Medical Engineering. During that call, Banks and Suissa each represented that Medical Engineering owned millions of Clinitest Rapid COVID-19 Self-Test kits manufactured by Siemens (the "Test Kits"), and that the Test Kits were available for sale and delivery to Plaintiff in New York within two weeks from the date of Plaintiff's payment. Defendants explained that Viking would broker the transaction, with Medical Engineering paying Viking a commission after the completion of the transaction.

6. Plaintiff was aware that, at the time, the market for COVID-19 self-test kits was exceptionally tight, and Plaintiff was only willing to deal with a supplier that could provide the Test Kits in the short timeframe it required. Thus, Defendants' representations of Medical Engineering's outright ownership and possession of the Test Kits, coupled with the representation that Plaintiff would receive delivery of the Test Kits within two weeks of payment, were material in inducing Plaintiff to enter into the transaction.

7. Relying on Defendants' representations, Plaintiff agreed to purchase the Test Kits from Medical Engineering through Viking. On January 18, 2022, Plaintiff issued a purchase order to Medical Engineering for 350,000 Test Kits at a per-unit price of $5.90, for a total purchase price of $2,065,000, with $1.8 million paid upfront and the remaining $265,000 balance to be paid upon

Plaintiff's receipt of the Test Kits (the foregoing is hereinafter referred to as the "Agreement"). A copy of that purchase order is attached hereto as **Exhibit A**.

8. On January 20, 2022, Plaintiff wired $1.8 million from its New York bank account to Medical Engineering and, pursuant to the Agreement, Defendants were required to deliver the Test Kits to Plaintiff on or before February 3, 2022. A copy of the wire confirmation is annexed hereto as **Exhibit B**.

9. Unknown to Plaintiff at the time, Defendants did not intend to provide Plaintiff with the Test Kits, and Defendants' representations of having outright ownership of the Test Kits were false when made.

10. Indeed, despite Defendants' representations, Medical Engineering did not own any Test Kits and, therefore, could not possibly supply them to Plaintiff.

11. Rather, Defendants, at all times, intended to enrich themselves at Plaintiff's expense by fraudulently inducing Plaintiff to pay them and then absconding with Plaintiff's funds, while never providing the Test Kits to Plaintiff.

12. In accordance with Defendants' representations and the Agreement, Plaintiff awaited receipt of the Test Kits by February 3, 2022 – two weeks after Plaintiff paid the deposit. As the day progressed and the Test Kits did not arrive, Plaintiff called Suissa and Banks to inquire as to the status of their delivery.

13. During a February 3, 2022 telephone call between me, Suissa, and Banks, Banks falsely claimed that the Test Kits were "stuck" at one of Defendants' warehouses in Frankfurt, Germany, and could not be released due to "FDA regulations." While bewildered as to how regulations implemented by the United States Food and Drug Administration could prevent a warehouse in Germany from releasing the Test Kits, Plaintiff, in an attempt to avoid further delay

in receiving the Test Kits, offered to directly take possession of the Test Kits from Defendants' German warehouse at its own cost and expense.

14. Confronted with this offer, Banks continued weaving his false tale by advising Plaintiff that "FDA regulations" prohibited Defendants from releasing the Test Kits to Plaintiff. When pressed by Plaintiff, Banks could not identify what supposed FDA regulations he was referring to and, ultimately, failed to provide anything resembling a coherent explanation as to Defendants' inability to provide the Test Kits.

15. Plaintiff now suspected that Defendants had defrauded it and demanded that Defendants immediately refund the entire $1.8 million. Banks and Suissa troublingly represented to Plaintiff that not all of Plaintiff's funds were immediately available for refund, but that Suissa would wire a partial refund of $600,000 from Viking to Plaintiff with the balance to come shortly.

16. Beyond not being able to provide the Test Kits, the fact that Defendants claimed to be unable to immediately refund all of Plaintiff's $1.8 million deposit was further cause for alarm. The fact that Suissa appeared to be in possession of Plaintiff's funds was additionally worrisome because Plaintiff wired the $1.8 million deposit to Medical Engineering. Viking and Suissa were not supposed to receive any commission compensation until after Plaintiff received the Test Kits, which did not occur.

17. On the verge of losing Corizon Health as its customer, the $1.8 million it wired to Defendants, and its associated profits, Plaintiff threatened legal action and demanded that Defendants immediately initiate a $600,000 wire transfer and provide Plaintiff with confirmation of such wire transfer to Plaintiff as proof.

18. To buy time and forestall Plaintiff's threats of immediate legal action and, apparently, to allow Defendants to complete distributing Plaintiff's $1.8 million among

themselves, Defendants provided Plaintiff with two fraudulent wire confirmations of Plaintiff's purported partial refund.

19. Specifically, on February 3, 2022, Suissa provided Plaintiff with a purported outgoing wire request stamped "customer copy" from Wells Fargo in the amount of $600,000 from Viking to Plaintiff (the "First Fraudulent Wire Confirmation"), a copy of which is attached hereto as **Exhibit C**.

20. By February 4, 2022, Plaintiff had not received the funds purportedly evinced by Defendants' First Fraudulent Wire Confirmation and Plaintiff called Suissa and Banks to inquire about the first $600,000 tranche of the refund. Suissa feigned shock and surprise that the $600,000 had not arrived and represented to Plaintiff that he would inquire with the bank. Later that same day, Suissa and Banks called Plaintiff and represented that the wire was pending and Plaintiff should receive the $600,000 imminently.

21. The following week, between February 7-9, 2022, Plaintiff placed numerous phone calls to Defendants regarding the status of its refunds and the Test Kits, all of which went unanswered.

22. Then, on February 10, 2022, Suissa provided Plaintiff with a screenshot of a purported wire transfer of $900,000 from a Chase bank account (the "Second Fraudulent Wire Confirmation") to Plaintiff's bank account and assured Plaintiff over the phone that Plaintiff would receive the partial refund shortly; however, the wire has never arrived. A copy of the Second Fraudulent Wire Confirmation attached hereto as **Exhibit D**,

23. Despite providing purported proof of a $900,000 wire transfer to Plaintiff, later that same day, on February 10, 2022, Suissa incongruously sent Plaintiff a video of the Test Kits supposedly earmarked for Plaintiff (the "Video"). In the Video, purportedly filmed at a California

warehouse, an unidentified person taking the Video stated that it was "February 9, 2022," and proceeded to describe the Video's depiction of 26 pallets of "iHealth" COVID-19 test kits, which the speaker identified as earmarked "for" Plaintiff's principal.

24. Notably, Plaintiff did not order iHealth brand COVID-19 self-test kits, but rather Siemens Clinitest Rapid COVID-19 Self-Test kits.

25. After Plaintiff questioned Suissa and Banks regarding the iHealth tests and Defendants' prior representations that Medical Engineering owned Siemens test kits (defined above as the Test Kits) that were supposedly available for immediate delivery to Plaintiff, Defendants admitted that their representations were false.

26. Suissa revealed that Medical Engineering did not actually possess or own the Test Kits at the time the parties entered into the Agreement, but rather, Defendants claimed that they tried to order them from Siemens to fulfill Plaintiff's order. In other words, Defendants expressly admitted to Plaintiff that they defrauded Plaintiff.

27. Nonetheless, still eager to provide its customer with some form of COVID-19 self-test kits and avoid defaulting on its commitments, Plaintiff agreed to accept the iHealth test kits and would arrange for them to be picked up at the California warehouse where the Video was purportedly filmed.

28. A few hours later, on February 10, 2022, Plaintiff's trucking company arrived at the California warehouse to pick up the iHealth test kits. Upon arrival, however, the warehouse advised that there were no COVID-19 tests available for, or allocated to, Plaintiff or its principal. As such, there was nothing for the trucking company to pick up and deliver, and Plaintiff incurred cancellation charges from the trucking company in the amount of $12,500. A copy of the trucking

company's cancellation invoice is annexed hereto as **Exhibit E**.  Moreover, the $900,000 supposedly sent through Defendants' Second Fraudulent Wire Confirmation had still not arrived.

29. Plaintiff immediately confronted Defendants about its inability to pick up the goods from the California warehouse. Defendants acted surprised and blamed the warehouse for a supposed miscommunication, while pushing Plaintiff to again send a truck to the warehouse to pick up the test kits. On February 17, 2022, Plaintiff again sent a truck to the California warehouse and, again, was advised that there were no COVID-19 tests available for, or allocated to, Plaintiff or its principal. As a result, Plaintiff again incurred cancellation charges in the amount of $12,500. A copy of the trucking company's cancellation invoice is annexed hereto as **Exhibit F**.

30. Plaintiff again immediately confronted Defendants and Defendants apparently realized that their scheme had been irreparably exposed. Now seeking to ward off litigation, Suissa caused Viking to transfer a small, partial refund of $200,000 to Plaintiff, while falsely promising the $1.6 million balance would be refunded shortly.

31. In the weeks following, Plaintiff continued to follow up with Defendants regarding the promised $1.6 million refund. Despite offering more excuses and making more false promises, Defendants failed to either pay any further refunds or deliver any COVID-19 self-test kits to Plaintiff.

32. Stated simply, each and every aspect of Plaintiff's interactions with Defendants was marred by Defendants' fraud. Defendants, admittedly, lied about Medical Engineering's ownership of the Test Kits. Thereafter, Defendants used the fabricated First Fraudulent Wire Confirmation, the Second Fraudulent Wire Confirmation, and the Video to aid and advance their fraudulent scheme to steal Plaintiff's funds and delay Plaintiff's discovery of their brazen theft to frustrate Plaintiff's ability to recover the funds and finalize dividing and secreting same.

33. As a result of Defendants' fraudulent scheme, breaches, and other misconduct, Plaintiff has been unable to meet its commitments to Corizon Health, of which Defendants were fully aware, and, in addition to the $1.6 million stolen by Defendants, has lost profits in the amount of at least $1,186,500 and incurred out-of-pocket expenses of $25,000 in connection with hiring a trucking company to go to the California warehouse.

34. On February 28, 2022, Plaintiff filed the Summons and Complaint seeking the remaining balance of $1.6 million plus its out-of-pocket expenses and its lost profit damages, set forth in greater detail below, which resulted from Defendants' fraudulent conduct and Medical Engineering's breaches.

**B.    Plaintiff's Damages**

35. Plaintiff has suffered out of pocket damages in the total amount of $1,625,000 as a result of Defendants' misconduct. This sum is arrived at by subtracting the $200,000 refund Defendants paid Plaintiff from the $1,800,000 deposit that Plaintiff paid to Defendants and adding the $25,000 in cancellation fees that Plaintiff incurred from the trucking company arising from Defendants' knowingly false representations that the California warehouse had test kits allocated for delivery to Plaintiff and available for pick up.

36. Plaintiff has also suffered lost profit damages. As set forth above, Plaintiff agreed to supply 350,000 Test Kits it was supposed to receive from Defendants to Corizon Health at a per-unit price of $9.29 for a total purchase price of $3,251,500. A copy of the purchase order to Plaintiff from Corizon Health is annexed hereto as **Exhibit G**.

37. According to my conversations with Plaintiff's trucking company, Plaintiff would have incurred costs in shipping the Test Kits to Corizon Health in the amount of $25,000.

38. However, as a result of Medical Engineering's breach, Plaintiff was unable to perform its obligations and did not receive the $3,251,500 payment from Corizon Health.

39. Consequently, because of Medical Engineering's breach, Plaintiff lost $1,161,500 in profits. This sum is arrived at by subtracting Plaintiff's estimated shipping costs ($25,000) and the costs of the undelivered Test Kits from Medical Engineering ($2,065,000) from the amount Corizon Health agreed to pay for the Test Kits ($3,251,500).

40. Accordingly, Plaintiff is entitled to a judgment in the amount of $2,786,500 (out of pocket damages of $1,625,000 plus lost profits of $1,161,500) plus pre-judgment interest from February 3, 2022, and post-judgment interest at the rate of 9% per year as provided for by New York statute.

41. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

WHEREFORE, Plaintiff requests that the Court enter a judgment by default in the amount of $2,786,500 plus pre- and post-judgment interest, and any other relief the Court may deem appropriate.

Dated: New York, New York
   June 27, 2022

                    Isaac Lefkowitz